**FLEMING OIL CO. et al. v. ANCO GAS CORPORATION et al.**

No. 4562.

Court of Civil Appeals of Texas. El Paso.
May 26, 1948.

Rehearing Denied June 30, 1948.

Maurice Cheek, of Fort Worth, for appellants.

W. B. Harrell, of Dallas, Simmons & Jacobs, of Corsicana, and Angus Wynne, of Longview, for appellees.

PRICE, Chief Justice.

This is an appeal from the judgment of the District Court of Dallas County, 44th

Judicial District. Fleming Oil Company, Fleming & Kimbell, Carter-Gragg Oil Company, Kay Kimbell and Wm. T. Fleming, individually and as Trustee and Independent Executor, sued Anco Gas Corporation, B. E. Byrd, W. O. Whiteside, Margaret Clark, a feme sole, Jack Frost and D. H. Byrd to recover damages for the alleged breach of a contract between their predecessors in interest and the Anco Gas Corporation. The individual defendants were guarantors of the performance of said contract by Anco Gas Corporation with the predecessors of the above enumerated plaintiffs. The trial was, before the court without a jury, and judgment that plaintiffs take nothing. On the motion of plaintiffs the court made up and filed findings of fact and conclusions of law.

In the contract sued on the plaintiffs' predecessors in interest are called "sellers" and the defendant Anco Gas Corporation "buyer". This designation will be used here, although one of the parties plaintiff was a party to the original contract, the others, as stated, having succeeded to the rights of the original sellers. The defendants other than the Anco Gas Corporation will be referred to as "guarantors". Such guarantors were and are stockholders in Anco.

Sellers and their predecessors in title were owners of interests in gas wells in the Long Lake field in Anderson County.

Buyer is and was at all relevant times the owner of a recycling plant by means of which it extracted condensate or distillate from the product of gas wells in said Long Lake field. It has never refined or processed said gas further than to extract therefrom this distillate. Such distillate is not an end product, but was sold and further processed and used as an important basic element in the production of end products such as aviation gasoline, butane, kerosene and several other end products.

On or about February 12, 1940, sellers entered into a contract with buyer providing in substance that buyer should through its plant process gas from certain wells of sellers, sell the liquid extracted from the gas, and pay to sellers the sum of 55% of the gross sale of the product and retain 45% thereof. This contract is long and goes into minute detail governing and conditioning the duties imposed and rights conferred upon the parties thereto. Paragraph 5 thereof is deemed of vital importance, and is here set out:

"Price: (1) Buyer shall pay Sellers for the petroleum and other liquid content extracted from said gas delivered hereunder fifty-five per cent (55%) of the gross proceeds derived from the bona fide sale by Buyer of the condensate or other product made by Buyer's plant from the gas delivered hereunder; and, in determining such gross proceeds, the actual gross sale price shall govern, after deducting therefrom gross production taxes. It is agreed, however, that any losses in transit which Buyer is required to bear in its sale of such products to other parties and any over or short settlement made between Buyer and the purchaser of such product shall be shared or borne by all interested parties on the basis of prorated settlement in the month in question. No other deduction whatsoever, either for credit losses, sales costs, or otherwise, shall be made in determining said prices provided, however, that Federal or State excise taxes (such as the present motor fuel tax) which may be included in invoices to customers shall be treated in the same manner as gross production taxes. Seven-eighths (7/8) of said fifty-five per cent (55%) of said gross proceeds shall be paid to Lessees and one-eighth (1/8) thereof shall be paid to the Royalty Owners, the calculations to be made as to each lease separately. Sales made to any subsidiary or affiliate of Buyer or to any officer, director or stockholder of Buyer, or to any firms or corporations in which Buyer or any officer, director or stockholder of Buyer owns either individually or collectively as much as a ten per cent (10%) interest shall not be considered bona fide sales for the purpose of this contract, and in the event of any sales by Buyer which are not bona fide sales, as specified Sellers, at their option shall have the right to require Buyer to account and make payment on the same basis as if Buyer had sold such products for the highest current

price received by any other person, firm or corporation selling products of like kind extracted from gas in the Long Lake field."

The parties operated without friction under this contract up to December 1942. Buyer extracted distillate from the seller's gas and sold same to a processing plant or refinery which is located in the Long Lake field near the recycling plant of buyer. This refining plant was known·as the Inland Refining Company and was operated by a partnership. On or about December 1942 the stockholders of buyer rented this refining plant from the owners thereof with an option to buy same. This option said stockholders exercised, and purchased said refining plant and have since such date operated same as a copartnership under the name of Inland Refining Company. Before the purchase of said plant, the then owners thereof had notified Anco they would not alter their plant so as to be able to produce aviation gasoline. Prior to the purchase of the Inland plant by the stockholders of buyer, said buyer had sold the distillate to said Inland Refining Company and accounted to sellers for 55% of the sale price. At the time the said copartnership acquired the Inland Refinery there was a contract of sale between such refinery and buyer. This contract was continued and after that the Inland Refinery purchased from buyer the distillate produced by its recycling of the gas of sellers. The Inland Refining Company further processed the distillate. In this processing said distillate was mixed with other oil products and end products were produced, such as aviation gasoline, butane and other products. The Inland Refining Company sold these products and appropriated the proceeds to the benefit of the copartnership. Sellers claim that on the sales made of the products produced by the Inland Refining Company they were entitled to 55% of the gross proceeds under paragraph 5 of the contract hereinbefore quoted.

The contention of sellers is they were to receive 55% of the price received on a bona fide sale made by the buyer; that the sale by the buyer to Inland Refining Company was not a bona fide sale. This contention is based on the provisions of paragraph 5 of the contract. Beyond any question this sale was to a copartnership in which the stockholders of buyer had more than a 10% interest, in fact one of the contentions is that there never was a sale made until after the further processing of the distillate by Inland Refining Company, and that sellers are entitled to 55% of the proceeds of such sale, in fact by inference, at least, the contention is that title never really passed from buyer to the Inland Refining Company. Paragraph No. 5 does certainly contemplate that the price to be divided in a proportion of 55% and 45% between the sellers and buyer was for a bona fide sale within the meaning of that contract. The sanction that the buyer would sell for a fair price at a bona fide sale was its own self interest; if the buyer looked for some profit out of the sale other than the price received this sanction was removed.

The contract provides for the contingency of non-bona fide sale of the product within the meaning of the contract. In that event "and in the event of any sales by buyer which are not bona fide sales, as specified sellers, at their option shall have the right to require buyer to account and make payment on the same basis as if buyer had sold such products for the highest current price received by any other person, firm or corporation selling products of like kind extracted from gas in the Long Lake field."

The findings of fact and conclusions of law filed by the trial court on the motions of appellant are detailed and comprehensive, and it is thought their reproduction in full will facilitate a discussion of the case:

### Findings of Fact.

"1. The contract marked Exhibit 'A' attached to Plaintiffs' petition was made and entered into by and between Defendant Anco Gas Corporation, as Buyer, and the predecessors in title of Plaintiffs to whose rights and obligations Plaintiffs have succeeded other than Carter-Gragg Oil Company which was an original party to the contract, as Seller, by virtue of which Plaintiffs and those under whom

they claim were bound to sell and said Anco Gas Corporation was bound to purchase petroleum or other liquid content extracted by Buyer from the gas produced from certain leases enumerated in said contract by Seller, and to account to Seller for 55% of the gross proceeds derived from the sale by Buyer of condensate or other product made by Buyer's plant from said gas after deducting therefrom gross production taxes. Large quantities of condensate were extracted and bought by Buyer from the gas produced by Seller under said contract.

"2. The petroleum and other liquid content extracted from the gas was and at all times has been condensate.

"3. The contract authorized Anco Gas Corporation to sell to any subsidiary or affiliate or to any officer, director or stockholder of Anco Gas Corporation, or to any firms or corporations in which Anco Gas Corporation or any officer, director or stockholder owned individually or collectively, as much as 10% interest. In the event a sale was made to such subsidiary or other individual or concern enumerated above, the Seller had the option to take the 55% of the actual gross sale price or to require the Buyer to account and pay on the same basis as if the Buyer had sold such products for the highest current price received by any other person, firm or corporation selling products of like kind (condensate) extracted from gas in the Long Lake Field.

"4. The individual Defendants were guarantors that Buyer would perform its obligations under its contract with Seller.

"5. The only relationship existing between Plaintiffs and Anco Gas Corporation at all times pertinent to this lawsuit was that of Buyer and Seller as set out in Paragraph XIX of the said contract.

"6. At all times pertinent to this suit the law exacted a gross production tax from the producer of gas on the petroleum products extracted from said gas and made it the duty of the first purchaser of said products to deduct the tax from the price paid to the producer and to pay the tax to the State of Texas. The contract herein involved recognizes the law and states the obligations of the respective parties under the law.

"7. Regular monthly statements which were prepared in accordance with the requests made by Plaintiffs' Auditor and attorney were furnished to Plaintiffs by Anco Gas Corporation showing that all of the gross production tax was deducted from Plaintiffs' 55% of the gross proceeds and that those said statements were furnished monthly for a period of more than six years. Plaintiffs made no objection to the deduction being made, nor did they ever intimate that this was not the correct method of calculation or that it was not in accordance with the contract prior to the filing of this lawsuit.

"8. 45% of the amount of gross production taxes deducted from Plaintiffs' share of the proceeds more than four years prior to the filing of this suit total $3,408.08 and interest at 6% per annum on such amount is $1,112.68.

"9. 45% of the amount of gross production taxes deducted from Plaintiffs' share of the proceeds within four years prior to the filing of this suit total $11,720.81 and interest at 6% per annum on such amount is $2,230.06.

"10. In December of 1942, B. E. Byrd, W. O. Whiteside, Margaret Clark, a feme sole, Jack Fros and D. H. Byrd, all being stockholders of Anco Gas Corporation, formed a partnership for the purpose of leasing with the intent to purchase Inland Refining Company, and that on January 1, 1943, they leased said refining company and began operating same. That thereafter during the latter part of 1943, said partnership purchased Inland Refining Company; that this lease and purchase of Inland Refining Company by the partnership above referred to was made in good faith because it appeared to be necessary at that time to make additions to said refinery which the then owners refused to do, in order to make certain products that were being demanded by the U. S. government. That said refinery was not purchased with the purpose of defrauding Plaintiffs or evading any obligations cast upon Anco Gas Corporation under the said contract.

"11. Anco Gas Corporation and Inland Refining Company were always conducted as separate and independent business enterprises, both before and after Inland Refining Company was leased then purchased by a partnership originally consisting of B. E. Byrd, W. O. Whiteside, Margaret Clark, Jack Frost and D. H. Byrd.

"12. After Inland Refining Company was leased then purchased by stockholders of Anco Gas Corporation Plaintiffs were paid on the same basis for the condensate produced by Anco that they had been receiving when Inland Refining Company was operated by other disinterested persons and that Plaintiffs suffered no damage or loss by virtue of the change of ownership above mentioned.

"13. The sales of condensate made by Anco Gas Corporation to Inland Refining Company were made in good faith and were the only sales made by Anco Gas Corporation of condensate extracted by it from Plaintiffs' gas.

"14. Anco Gas Corporation has accounted to Plaintiffs for 55% of the gross proceeds after deducting gross production taxes of all sales of products (condensate) extracted by Anco Gas Corporation from the gas furnished to it by Plaintiffs under the contract.

"15. Plaintiffs offered no evidence that Anco Gas Corporation failed to 'account and make payment on the same basis as if Buyer had sold such products for the highest current price received by any other person, firm or corporation selling products of like kind (condensate) extracted from gas in the Long Lake Field.'

"16. Plaintiffs' exhibit No. 15 correctly states the facts set forth therein.

"17. The gross proceeds as shown on said Exhibit No. 15 represent only the amounts received by Anco Gas Corporation from Inland Refining Company for the condensate or distillate recovered from plaintiffs' gas, and do not represent the amounts received by Inland Refining Company from the sale of the liquid end products recovered by Inland Refining Company from that part of the Anco distillate recovered from plaintiffs' gas.

"18. The constituent elements present and contained in the gas delivered by plaintiffs to Anco Gas Corporation included some of each of the liquid end products recovered by Inland Refining Company from the commingled mixture of raw products.

"19. The individual defendants have at all times since January 1, 1943, owned more than 10% interest in Inland Refining Company."

## Conclusions of Law.

"1. The only relationship which existed between Plaintiffs and Anco Gas Corporation was that of Buyer and Seller as set out in Paragraph XIX of said contract.

"2. The only relationship existing between Plaintiffs and Defendants other than Anco Gas Corporation was that said other Defendants were guarantors that Anco Gas Corporation would fulfill its obligations under said contract.

"3. Plaintiffs failed to show that Anco Gas Corporation has in any manner breached the contract sued on or failed to make payment on the standard or basis established in said contract.

"4. The contract between Plaintiffs and Anco Gas Corporation had no provisions relieving Plaintiffs (as producers) from paying the gross production taxes on the condensate extracted from the gas produced by them as provided by law at all times pertinent to this suit. (Articles 7057a and 7047b, V.A.C.S.)

"5. In the event the court has misunderstood the intent of the parties as evidenced by the language of the contract and the interpretation placed on it through the years by the parties thereto to the effect that Anco Gas Corporation did not assume the payment of any gross production taxes on the condensate extracted from the gas produced by Plaintiffs and that no provisions of said contract relieve Plaintiffs of the burden placed on them by law to pay said taxes, then the court concludes that all claims by Plaintiffs for the amount of gross production taxes incorrectly deducted by Anco Gas Corporation from payments to Plaintiffs for condensate made prior to four years next preceding the filing of this suit are barred by limitation."

■ The Findings of Fact do not seem to be attacked by appellants. The Conclusions of Law are attacked by some of the points of error. Some of the findings of fact are in reality conclusions of law, and are so attacked. Paragraph 3 of findings of fact in substance that under the contract Buyer had a right to sell to its stockholders is more in the nature of a Conclusion of Law than a Finding of Fact. It amounts to the construction of the written contract. It is not deemed very material to the disposition of the case, even though such a sale amounts to a breach of the contract. In fact, it is thought it does not constitute a breach. It attempts to provide the measure of Sellers' rights in the contingency of such a sale. It is thought the Sellers' contention is that in case of such a sale or attempted sale they had the option to either consider such a sale as void and recover 55% of the sale price after said distillate is further processed by the Inland Refinery and sold, or the option to require Buyer to account and make payment on the same basis as if Buyer had sold said products for the highest current market price. In the event buyer sells to a concern in which it or its stockholders have 10% interest or more, then such sale shall not necessarily fix the amount Sellers were to receive. In such a contingency Sellers would certainly have the right to demand 55% of the actual sale price, but are not bound to exercise such right and may avail themselves of the alternative right given by the contract.

The true meaning of said contract we think is that Sellers have an option to take the price for which the Buyer actually sold or the highest current price as provided.

■■ It is true it is not specifically provided in the contract the extent to which Buyer shall process the gas. It is thought, however, that in arriving at the intent of the parties, which is the fundamental aim of all construction of a contract, the situation of the parties at the time of entering into the contract is to be taken into consideration. 10 Tex.Jur. Sec. 159, p. 272, and authorities cited; 10 Tex.Jur. Sec. 169, p. 293, and authorities cited.

At the time the contract was entered into the Buyer had a plant which was not suitable to convert the distillate into the products produced by further refining by the Inland Refining Company. At the very time of entering into this contract the plant of the Buyer was in operation. It was suitable for extracting distillate from the gas, but end products could not be manufactured without great expense and the alteration of the plant. Section 2 of paragraph 5 binds the Buyer to extract from the gas 72% of the petroleum and condensate contained therein, and provides for a test to determine this. Up to January 1943 distillate was the only product produced by the Buyer and up to this date has been its only product. The grade of the distillate was perhaps improved. Monthly settlements were called for by the contract. There was no evidence that these settlements were not made as called for in the contract, nor that Sellers did not accept the production of distillate as conforming to the contract. In our opinion it was the mutual intention of the parties that the production and sale of distillate should be deemed a performance of the contract. It is true, perhaps, that at the election of Buyer the Buyer might have processed the gas or distillate further had it so optioned. After January 1943, a copartnership composed of the stockholders of Buyer bought the distillate from the Buyer and processed same further. As has been stated, it is the contention of Sellers that this further processing by the copartnership was equivalent to a further processing by the Buyer, and that they are entitled to 55% of the gross selling price. It follows, we think, as a corollary to this contention that the sale was insufficient to vest the title in the copartnership.

■ Sellers concede that the legal title to this distillate was vested in Buyer. If this be true, Buyer could convey legal title thereto. The sale was not void, but voidable, at best. The only object of the requirement of a sale by the Buyer was to fix the amount of compensation due the Sellers. In case of a sale in which the Buyer or its stockholders or officers might have an interest the contract provided that the

Sellers should have an option to determine the amount due them in another manner. That manner was by the application of the highest current price for which like products sold in that vicinity. It is hardly to be presumed that it was in contemplation of the parties that Buyer could sell condensate for a higher price than the highest current price paid in the district for similar products. If sellers' compensation were measured by the alternative provision of the highest current price for similar products, substantially the same price would be received as though it were measured by the sale in which neither the buyer, its officers nor its stockholders were interested.

■ There may be a presumption against the fairness of a sale made by a corporation to its stockholders. Even though this be true here, if as great a price had been secured as could have been obtained, then no damage was suffered by seller. This is not an action to set aside the sale made to the copartnership. What is sought is to reap the benefits of a sale made by the copartnership after additional and further labor and material were expended on the property the sale of which was to determine the compensation of sellers. It is thought to measure the compensation of sellers by the sale of entirely different products than that contemplated in the contract between the parties. What is sought is to measure the compensation of sellers by the sale of products which through accession by labor and additional materials are entirely different products from that the sale of which was to measure the price to be paid sellers. Gas condensate or distillate is as different from aviation gasoline as the grapes used in its production are from champagne.

That the buyer, its stockholders or affiliates might become interested in using the condensate in the production of the end products seems to have been contemplated by the parties. The consequence of the occurrence of this contingency was that the sellers were not limited to 55% of the sale price so made by the buyer, but were entitled to 55% of the highest current price for which such similar products were sold

in the current market, this if they so elect. In short, the sellers were not bound by a sale by the buyer in which the buyer had an interest, direct or indirect. The sellers had election in case of such a sale; at their election the buyer was bound by another standard.

In this case sellers have not sought to apply the standard provided in the contract, but have sought to apply the standard of sales made, not by the buyer, a corporation, but made by a copartnership; sales of entirely different products from that contemplated by the parties to the contract.

■ Sellers assert that the trial court held that they were bound by the sales as made to the Inland Refining Company after January 1, 1943. This complaint is not borne out by the record. What the trial court held, in substance, was there was no evidence that the highest current price of condensate exceeded the price paid and for which buyer has accounted to sellers. The burden was upon sellers to make this showing—to show what, if anything, they were entitled to under the standard furnished by the contract in case buyers sold to the officers or stockholders of buyer. This contract provided two standards for determining what buyer should pay, one in case the buyer sold to a disinterested third person, the other in case buyer sold to one of its affiliates, officers or stockholders. As has been said the sellers at their election might take their percentage at a price paid buyer by the Inland Refining Company. Conceivably it might equal or be more than similar products sold for in the current market.

There was another count in sellers' petition whereby they sought recovery for over-deduction by buyer of the gross production taxes. Buyer deducted the gross production tax chargeable against sellers from sellers' 55% of the sale price of the condensate. Sellers contend that the production tax should have been deducted from the gross sale price of the condensate, and then sellers were entitled to 55% thereof and buyers to 45%. The trial court overruled this contention, and its reason is stated in paragraph 4 of the Conclusions

of Law. In substance it is held that under Article 7057a and 7047b, V.A.C.S., that under the law it was incumbent on the producers to pay this tax. Sellers were producers of the gas. Articles 7057a and 7047b do put this burden on the producer and the one who extracts the condensate has the burden of seeing that the tax is paid. The 55% of the sale price of the condensate, or 55% of the highest current value of the gas was in payment, not of the gas, but for the product extracted therefrom; the gas after processing was to be reinjected and returned to the premises of sellers. Paragraphs 6 and 7 of the Findings of Fact relating to the deduction by buyer of this tax in substance reflect that with notice to sellers that buyer had for a period of more than six years deducted the total tax from the 55% of the sales price which was due the sellers and these deductions were reflected in monthly statements furnished to sellers by the buyer. The sellers up to the time of filing this suit had, so far as the evidence shows, never made any objection to these deductions. If there is any room for interpretation or construction of the provisions of the contract involved this course of conduct reflected by the Findings of Fact would strongly tend to show the construction put upon the same by the parties, strong evidence of the expressed intention of the parties.

■ Sought by either interpretation or construction of a contract is the intent expressed therein by the parties.

10 Tex.Jur. Sec. 159, p. 272 and authorities there cited.

■ The meaning of the provision as to division of gross proceeds 55% and 45% after the deduction of the gross production taxes seems too plain to require or justify either construction or interpretation. The only evidence that the provision bore another meaning to buyer and to sellers is that buyer for several years made monthly settlements with sellers and in this settlement the entire production tax was taken out of the 55% of the gross proceeds, the measure of compensation to the sellers. So far as evidence goes, sellers never at any time prior to the filing of this suit protested this method of settlement. It is fairly obvious from the reports made to sellers the said method was used in arriving at the amount due them. There was no evidence save and except the settlement between the parties that there was any local trade or unusual meaning attached to the words used in the memorial of the contract. It is true that Articles 7057a and 7047b do charge the production taxes against the producers (the sellers in this instance) and make it a duty of the processor (the buyer here) to see that same were paid. However, it was entirely lawful for the buyer and sellers to make any contract they pleased relative to the payment of the production taxes. Referring back to Paragraph 5 of the contract in question, the language there used is clear and explicit as to the matter in controversy. In our opinion there is nothing in the language of the contract; there is nothing in the evidence of matters de hors the contract that would justify attaching to the language used any other meaning than its literal meaning.

■ The construction of the parties is only admissible where there is an ambiguity in the contract. If the meaning of a contract is plain the acts of the parties cannot justify an interpretation contrary to the plain meaning. 10 Tex.Jur. p. 300, Sec. 171; Lewis v. East Texas Finance Co., 136 Tex. 149; 146 S.W.2d 977; Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504; Richardson v. Hart, 143 Tex. 392, 185 S.W.2d 563.

■ There is no evidence of an estoppel here. The meaning of this contract is by virtue of the language used, clear and definite. In our opinion the four years Statute of Limitation bars sellers' recovery for all over-deductions occurring four years or more prior to the institution of their suit, and it is so held. There is no trust relationship between the parties buyer and sellers created by the contract. Beyond question buyer should in good faith keep the contract. Sellers were under no disability. Findings of fact No. 9 reflects that 45% of the amount of the gross pro-

duction taxes deducted from Sellers' share of the proceeds within four years prior to the filing of the suit total $11,720.81; that interest at 6% per annum amounts to $2,030.06. Sellers are entitled to recover for that amount.

It is therefore ordered and adjudged that the judgment of the trial court is hereby reversed and judgment is here rendered in the amount aforesaid, together with interest thereon at the rate of 6% per annum.