**CHAMPLIN OIL & REFINING COMPANY
et al., Appellants,**

**v.**

**M. B. CHASTAIN et al., Appellees.**

No. 3884.

Court of Civil Appeals of Texas.

Eastland.

May 29, 1964.

Rehearing Denied June 19, 1964.

Cantey, Hanger, Gooch, Cravens & Scarborough, Cecil E. Munn, Ft. Worth, for appellants.

Jackson, Walker, Winstead, Cantwell & Miller, Conan Cantwell and Jack Pew, Jr., Dallas, for appellees.

WALTER, Justice.

M. B. Chastain, Vincent A. Hughes, John P. Costello, and Grace C. Woolley, Bennett L. Woolley, Jr., James C. Woolley, Margaret W. Strong, and Grace Woolley Gowan, independent executors of the estate of Bennett L. Woolley, deceased, filed suit against Champlin Oil & Refining Co., a corporation, and others on a gas processing contract. The plaintiffs will be referred to as Chastain and the defendants as Champlin. Chastain owned four producing natural gas wells. Champlin owned and operated a natural gas processing plant in the Carthage field in Panola County, Texas. Natural gas is delivered into the plant from wells owned by Champlin, Humble, Pan American, Chastain and others. Approximately 50% of the gas that goes through the plant is owned by Champlin. Approximately 10% is owned by Chastain. Champlin extracts propane, motor fuel, fuel oil, kerosene, liquid petroleum gas and other products, hereinafter referred to as plant products, from this gas.

Chastain pleaded that Champlin breached its contract by allocating plant products contrary to the formula described in the contract. Champlin admitted in its answer that it had not used the contract allocation formula. It alleged that through a mutual mistake of fact Section 8 of the contract, the provision containing the allocation formula, was inserted in the contract. Champlin pleaded as defenses unjust enrichment, equitable estoppel and mutual mistake of fact. It also pleaded the four year statute of limitation.

A jury found that Chastain, prior to the time he met John McNamara, could have discovered by the use of ordinary care that the allocation method used by Champlin was different from the contract allocation formula; that Chastain by acts, conduct and silence led Champlin reasonably to believe that Chastain approved of the continuation of the allocation method used by Champlin; that Champlin relied upon such acts, conduct or silence; that, but for such acts, conduct or silence of Chastain, Champlin would have taken voluntary action or legal proceedings to protect itself against loss resulting from the use of more than one allocation method; that Chastain delayed in asserting a claim against Champlin for a length of time sufficient that Champlin would have good reason to believe that Chastain would not assert any claim because of the difference between the allocation method used in the production and disposition reports sent to Chastain and the allocation formula described in the contract; but that during such period of delay Champlin had not changed its position in a way which would make it unjust for Chastain to assert such a claim, and that Champlin's plant allocation method has distributed to the Chastain wells the amount of liquids produced by such wells.

The jury also found that Chastain did not know prior to the time he met John McNamara that the allocation method used by Champlin was different from the allocation formula described in the contract; that Champlin had equal knowledge or access to equal knowledge as did Chastain that the plant allocation method used was not the allocation method provided for in the contract; that with such equal knowledge or access to such equal knowledge Champlin failed to exercise ordinary care to protect itself from injury or detriment, and that Champlin failed to use ordinary care in failing to advise Chastain that the method of plant allocation that Champlin was using resulted in Chastain being allocated less plant products than was provided for in the contract.

The court rendered judgment for Chastain for $77,167.89, for Hughes $25,722.63, for Costello $25,722.63 and for Woolley $25,722.63.

Champlin has appealed and contends the court erred in refusing to render judgment for defendants upon the jury's findings on the issues relating to equitable estoppel, and in granting plaintiffs' motion to disregard the jury's findings on said issues; in re-

fusing to find that a mutual mistake was conclusively shown by the evidence or, alternatively, in refusing to submit to the jury defendants' affirmative defense of mutual mistake; in excluding from consideration by the jury the testimony and exhibits of the witnesses Frank L. Jones, Berry Holmes, Garman Kimmell, and Harlan Echols; and in granting judgment to plaintiffs for money allegedly due under the written contract prior to four years next preceding the commencement of this suit.

The appellees present a cross point that the court erred in failing to award them attorney's fees of $25,000.00, because they proved a valid claim for material furnished.

Chastain telephoned Charles B. Johnson, vice-president of Champlin in 1956, and informed him that he had some gas that was available for processing. Chastain told Johnson "This is pretty rich gas, and it will take—ah—you will have to cut your process fee down pretty low to get it." Johnson told him, "Well, we will take a look at it and see if we can do it." On September 17, 1956, Champlin mailed Chastain a natural gas processing agreement and in its letter of transmittal said: "These contracts are somewhat flexible and may be altered to a specific condition and processing consideration." Johnson referred to this contract as "a form of contract that we had used before."

On September 18, 1956, Champlin wrote another letter to Chastain correcting an error made in its September 17, 1956 letter and said: "Will you please be advised that the second paragraph of the cited letter should read '60% Propane' instead of '65% Propane.'"

Champlin wrote Chastain on September 25th, 1956, enclosing the test data which it had accumulated on one of Chastain's wells and said: "We are in hopes that this data will be of assistance to you in evaluating your gas in this area and that we may continue our discussion of the Processing Agreement as submitted by our letter of September 18, 1956. We want to discuss this Processing Agreement with you and invite your inquiries or questions concerning it."

On October 9th, 1956, Champlin wrote Chastain and informed him of five changes they had made in the original agreement. One of these changes was with reference to Section 8. Section 8 is the provision in the contract that Champlin contends was inserted by mutual mistake. In said letter Champlin said: "4. Section 8, page 9— 'Determination of the Quantity of Plant Products Derived from Producers Gas and the Volume of Residue Gas to be Delivered Back'." "This section has been changed to read in barrels per million cubic feet instead of GPM (gallons per thousand cubic feet). This change was made in order to bring our Processing Agreement in line with Accounting Procedures. Also under Section 8, paragraph (a) sub-paragraph 1, a third paragraph has been added which stipulates who shall bear the cost of retests which may be requested by either party."

The final draft of the contract was prepared by Champlin and signed by all the parties on October 25th, 1956. The allocation formula as set forth in Section 8 of the contract was not followed by Champlin. It followed what it describes as its "improved plant allocation method." The parties stipulated that: "The difference in the sale value of plant products derived from gas produced from the M. B. Chastain wells as the amounts of such products were determined by said plant allocation method and the sales value of such plant products if the amounts thereof had been determined by the allocation method described in said natural gas processing agreement may be calculated with mathematical certainty. * * * the parties hereto have agreed that the difference in the principal amount of such sales value for each month from June 1, 1957, through July 31, 1961, is as shown in Column 5 on said Stipulation Exhibit A. It is agreed and stipulated that if defendants had accounted to the plaintiffs for each of such months for plant products

derived from gas produced from the M. B. Chastain wells determined by means of the allocation method described in said natural gas processing agreement rather than by means of said plant allocation method, the amount of additional payments which would have been made by the defendants to the plaintiffs is as shown in Column 5 of said Stipulation Exhibit A. * * *

"It is the purpose and intention of this stipulation to agree upon the principal amounts in dispute for each of the calendar months covered hereby and without waiving the contentions of either party with respect to whether additional amounts of principal or interest are due by the defendants to the plaintiffs for any or all of said calendar months." Column 5 of said stipulation A reveals that if the sales value of plant products had been determined by the allocation method described in the contract Chastain would be entitled to an additional $118,076.25.

Humble and Pan American audited Champlin's books in 1958 and discovered that the method used by Champlin in distributing plant products was different from the allocation provision provided for in the contract. On September 12, 1958, Champlin wrote Chastain the following letter:

"Humble Oil & Refining Company and Pan American Petroleum Corporation have just completed an audit of Champlin's books covering our Carthage Plant operations for the period from August 1, 1955, through December 31, 1957. Since commencement of processing at the Carthage Plant in 1946, these two companies have audited the operation of this plant for themselves and on behalf of others four separate times starting in the year 1950.

"During this most recent audit (just completed in 1958) a question was raised for the first time as to the language in the processing agreements as compared to the actual procedure used by Champlin for the allocation of plant liquids which procedure was agreed upon and set forth in a letter agreement dated June 8, 1948, between the Panola County Royalty Owners Association and The Chicago Corporation (now Champlin Oil & Refining Co.) and a letter from the Royalty Owners Association to The Chicago Corporation dated June 11, 1952.

"The procedure used in allocating plant liquids since this agreement was made with the Royalty Owners Association is fully reflected in the 'Gas and Liquid Production and Disposition Report', complete copies of which you receive monthly. After a review of the matter, Humble agrees with Champlin that this procedure, which has been in actual use since 1948 and as adjusted slightly in 1952, is most equitable and after reviewing the entire matter Pan American expresses no disagreement with the procedure.

"Certainly, a prime requisite for a fair and equitable allocation of liquid products derived from a commingled stream of gas is that the allocation method and procedures for each and every source of gas be identical. We have, therefore, been employing the procedure all this time, and all parties have been fully advised of the allocation through the monthly reports mentioned above.

"We take this opportunity of advising you that it will be our practice to continue to employ the aforementioned procedure as to all producers connected to our plant. If you have any question as to the procedure as heretofore employed, and which we propose to continue, or as to any other matters pertaining to our processing agreement with you, we will be glad to discuss the matter with you. Unless we hear from you to the contrary within thirty (30) days, we will consider that our suggestion for continuing this procedure meets with your approval."

Chastain testified that the first time he was aware that Champlin was not perform-

ing its contract was the latter part of February or the first part of March 1961. This was at a meeting at the Baker Hotel in Dallas, Texas, with Dick Castleberry, and a lawyer by the name of John McNamara. Castleberry informed him on that occasion that Champlin owed him about $200,000.00. Chastain claimed that he had no reason to know that the allocation method actually used by Champlin was different from the method provided for in his contract.

■ We find no merit in Champlin's point on estoppel. The record is silent about any statement made by Chastain or any overt act on his part which could have misled Champlin into believing that he was giving up his rights under the contract. Its defense of estoppel is based on Chastain's negative conduct in remaining silent after he received their letter about the audit made by Humble and Pan American.

"The doctrine of estoppel is for the protection of innocent persons, and only the innocent may invoke it. There is, in the very nature of the doctrine, some element of the maxim that one must come into a court of equity with clean hands. It is essential that the party claiming the benefit of the estoppel should have proceeded in good faith, and with reasonable diligence." 31 C.J.S. Estoppel § 75, p. 453. "A person may not base a claim of estoppel on conduct, omissions, or representations induced by his own conduct, concealment, or representations, especially when fraudulent." 31 C.J.S. Estoppel § 75, p. 454. "Mere silence of itself will not raise an estoppel. To make the silence of a party operate as an estoppel the circumstances must have been such as to render it his duty to speak, and there must also have been an opportunity to speak. It is essential that the one claimed to be estopped should have had knowledge of the facts, and that the adverse party should have been ignorant of the truth, and have been misled into doing that which he would not have done but for such silence." 31 C.J.S. Estoppel § 87, p. 485.

■ Champlin's letter was calculated to deceive and mislead Chastain. For example, the letter states:

"After a review of the matter, Humble agrees with Champlin that this procedure, which has been in actual use since 1948 and as adjusted slightly in 1952, is most equitable and after reviewing the entire matter Pan American expresses no disagreement with the procedure."

Humble's audit revealed a breakdown on the distribution of plant products for the month of November, 1957. This was attached to their audit and designated as Schedule 2. This Schedule revealed that for said month Champlin received more than 4,000 barrels, Humble more than 1,000 barrels and Pan American more than 1,000 barrels of plant products, under the allocation method used by Champlin, than they would have received under the contract formula. For said month Chastain received 4,241.78 barrels less than he was entitled to receive under his contract. Humble's audit and Schedule 2 were in their possession at the time the letter was written. These were not furnished to Chastain. Champlin failed to inform Chastain in their letter that he was receiving less money proceeds from plant products than he was entitled to receive under his contract. There was ample evidence to support the jury's answers that Champlin failed to use ordinary care in failing to advise Chastain that the method of plant allocation that Champlin was using resulted in Chastain's being allocated less plant products than was provided for in the natural gas processing agreement; that Champlin had equal knowledge or access to equal knowledge as did Chastain that the plant allocation method being used was not the allocation method provided for in the written contract, and that with such equal knowledge, or access to equal knowledge, Champlin failed to exercise ordinary care to protect themselves from injury or detriment.

We find no merit in Champlin's point that the court erred in failing to submit its requested issues on mutual mistake because there was no evidence to support them. Champlin contends that Section 8 was placed in the contract by mutual mistake. Champlin wrote the contract. It changed Section 8 before the final draft of the contract was signed. Now it says that the mutual mistake "consisted of the erroneous belief by both Champlin and Chastain that the written instrument accurately described the allocation method in use in the plant as the parties intended." Champlin's vice-president Johnson testified that the contract allocation method is one which is in common use in gas processing plants in the Carthage field, and that the Carthage Corporation and United Gas Pipeline use substantially the same allocation method as is provided for in Section 8. Before he signed the contract, Chastain consulted with an attorney in Shreveport. Hughes examined the contract himself and had it examined by an oil and gas attorney in Dallas. He had it examined by an officer who was in charge of oil loans at a Dallas bank. He also had it examined by a Mr. Finnell of the bank's engineering department. The record conclusively shows that none of the appellees discussed or agreed to Champlin's plant allocation method. The only method agreed upon was that stated in Section 8, which was written into the contract by Champlin. Vice-president Johnson testified he had never discussed its plant allocation method with any of the appellees. The Supreme Court in Sun Oil Co. v. Bennett, 125 Tex. 540, 84 S.W.2d page 447 said:

"If one of the parties intended that the lease cover and affect adjoining land owned by the lessor, there was no mutual mistake in the execution of the lease containing language which included such land. In the absence of fraud or inequitable conduct, a written instrument will not be reformed on account of mistake, unless the mistake is mutual; that is, a mistake common to both parties, both laboring under the same misconception in respect to the terms of the instrument."

A mutual mistake concerning a material fact does constitute a ground for reforming a contract, but the mistake must be mutual and not unilateral. 13 Tex.Jur.2d p. 480.

We are unable to agree with Champlin's contention that the court committed reversible error in excluding the testimony and exhibits of the witnesses Jones, Holmes, Kimmell and Echols. Rule 434, Tex. Rules of Civil Procedure.

There was severed from this suit Chastain's claim for money due after August 25, 1961. Chastain's claim herein is for money due on or before August 25, 1961. His first payment was due on July 25, 1957. This suit was filed November 30, 1961. Champlin pleaded that Chastain's cause of action which accrued prior to November 30, 1957, was barred by the four year statute of limitation. $20,336.98 of the total amount of the judgment herein represents principal due more than four years preceding the filing of this suit. Champlin paid Chastain $754,035.81 by using its unauthorized plant allocation method. The parties stipulated that if Champlin had used the allocation method provided for in the contract they would be entitled to receive from Champlin $872,112.06. The judgment in favor of Chastain is for the difference between what Champlin owed and what it paid, namely, $118,076.25, plus interest.

Chastain contends the presumption is that a payment will be credited to the oldest item on the account and that Champlin was required to overcome this presumption. Champlin contends that any amount due prior to November 30, 1957, is barred by the four year statute of limitation. Chastain contends that no application of payment was made by either party. For gas furnished in June 1957 payment was due on July 25, 1957. It was specifically designated as payment for gas furnished in June 1957. This is also true with reference

to July, August, September, October and November 1957. Champlin made a specific application of its payment for each month and Chastain received it and so applied it. Champlin's fourth point on limitations is sustained. The judgment is reformed by deleting therefrom all sums due prior to four years next preceding the commencement of this suit. Fleming Oil Co. v. Anco Gas Corporation, Tex.Civ.App., 217 S.W.2d 29.

■ Appellees cite, in support of their cross point for attorney's fees, Texas Gas Corporation v. Hankamer, Tex.Civ.App., 326 S.W.2d 944, (Writ Ref. N.R.E.). The court allowed attorney's fees in the Hankamer case under the provision of Article 2226, for "materials furnished", for gas and gas distillate sold to the Texas Gas Corporation. The contract contemplated the sale by Hankamer of gas and distillate and the purchase of such products by Texas Gas. It was contemplated that the title to such property pass and that the relationship of creditor and debtor result therefrom.

Chastain as the producer and Champlin as the processor agreed as follows:

"Processor shall pay to Producer monthly, on or before the 25th day of the month, the sums received by Processor during the preceding calendar month for the quantities of Producer's portion of plant products derived from Producer's gas, if any, theretofore marketed under the provisions of this agreement as agent for and for the account of Producer less the amount of all production, gathering transportation and similar taxes, if any, actually paid by Processor, which are applicable to such quantities."

Chastain, as principal, was delivering gas to Champlin, as his agent. Under these facts, Chastain was not entitled to recover attorney's fees under the "material furnished" provision of Article 2226, Vernon's Ann.Tex.Civ.St.

The judgment is reformed and affirmed.