**LONE STAR GAS COMPANY, Appellant,**

v.

**EFP CORPORATION, Appellee.**

No. 10–99–131–CV.

Court of Appeals of Texas, Waco.

March 8, 2000.

Ordered for Publication Dec. 20, 2001.

Randall C. Grasso, Dallas, for appellant.

Daniel C. Bitting and Derek Tod Gilliland, Scott Douglas & McConnico, Austin, Ron Butler, Marlin, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice CAMPBELL (Sitting by assignment).

## OPINION

VANCE, Justice.

Lone Star Gas Company sued EFP Corporation for breach of two natural gas service agreements, alleging EFP failed to pay for gas delivered to its plastic molding manufacturing plant in Marlin, Texas. EFP moved for summary judgment on both claims, asserting a statute of frauds defense against the first claim and a contractual defense against the second. The trial court granted EFP's motion in its entirety, and Lone Star appeals. We will affirm.

## FACTS

Lone Star began delivering gas to EFP's Marlin plant on November 3, 1993. At that time, EFP was categorized by Lone Star as a commercial gas customer. Within the City of Marlin, Lone Star's relationship with its commercial gas customers is governed by Lone Star's franchise agreement with the city, enacted as a city ordinance. The franchise agreement grants Lone Star the exclusive authority to contract with Marlin residents for gas service and vests rate-setting authority in the city. On March 6, 1995, EFP and Lone Star entered into a written contract for industrial gas service, which governed the relationship between the parties from that date until the present. As an industrial gas customer, EFP's rates are governed by Lone Star's three-tiered schedule of industrial rates.

EFP's gas consumption at its Marlin plant is measured by an on-site gas meter. The meter uses six dials to measure the amount of gas consumed. Each month, Lone Star employees read the meter's dials and entered the data into Lone Star's customer information system. The system contains information about each of Lone Star's gas customers, including the type of meter used and the rate at which the customer is billed for gas. Each month, the system computes each customer's bill based on the data gathered from the customer's meter and the current rate at which the customer is charged.

In August of 1997, Lone Star discovered that the customer information system contained erroneous information about EFP's account. Although the meter located at EFP's Marlin plant used six dials to measure the amount of gas consumed, the system listed EFP as using a five-dial meter. As a result, Lone Star's meter

readers gathered data from only the first five dials on EFP's meter, ignoring the sixth. EFP's monthly gas consumption was therefore represented by a five-digit number instead of a six-digit number. Consequently, EFP was charged for only one-tenth of the gas Lone Star alleges it actually consumed.

Lone Star discovered the error in August 1997. Because the error occurred during the initial activation of EFP's gas account, all the invoices sent to EFP between November 1993 and August 1997 were erroneous. Lone Star attempted to estimate the actual amount of gas used by adding a zero in the last digit to represent the sixth dial. On August 14, Lone Star sent EFP a bill for $496,817.14, representing the difference between the amount EFP had been billed and the price of the gas Lone Star calculated that EFP had actually consumed. EFP did not pay.

## PROCEDURAL HISTORY

Lone Star sued EFP for breach of contract, seeking $165,858.84 for gas allegedly delivered from November 3, 1993 to March 5, 1995 under the commercial account and $330, 958.30 for gas allegedly delivered from March 6, 1995 to June 30, 1997 under the industrial contract. EFP moved for summary judgment on both claims. With respect to the commercial claim, EFP argued that the Texas statute of frauds barred Lone Star from enforcing any claim for volumes beyond those recorded in Lone Star's written invoices during the term of the commercial agreement. Lone Star responded that EFP's receipt and acceptance of gas removes the claim from the requirements of the statute of frauds and renders EFP liable for the contract price of gas delivered but not reflected in the written invoices. With respect to Lone Star's claim under the industrial contract, EFP argued that the contract ren-

ders Lone Star's meter measurements conclusive and therefore bars Lone Star from later challenging the accuracy of the measurements. Lone Star responds that the error in question was a billing error, not a measurement error, and thus the clause is inapplicable to its claim. The trial court granted EFP's motion on both grounds, and Lone Star brought this appeal.

## STANDARD OF REVIEW

The standards for review of a summary judgment are well established. We must determine whether EFP met its burden by establishing that no genuine issue of material fact exists. *See Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). EFP bears the burden of proving its entitlement to the summary judgment as a matter of law. *See Nixon*, 690 S.W.2d at 548; *Roskey v. Texas Health Facilities Comm'n*, 639 S.W.2d 302, 303 (Tex.1982) (per curiam); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965). We must accept all evidence favorable to the non-movant as true, indulging every reasonable inference and resolving all doubts in favor of the non-movant. *Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex.1993). We will consider evidence which favors EFP only if it is uncontroverted. *See Great Am. Reserve*, 391 S.W.2d at 47. We assume for purposes of this appeal, and EFP does not contend otherwise, that EFP in fact received gas in excess of the amount reflected by Lone Star's monthly invoices. We limit our review to the sole question of whether Lone Star has raised a genuine issue of fact as to the existence of a breach of contract claim.

## THE COMMERCIAL ACCOUNT

■ EFP's motion for summary judgment argued that any claim arising from its commercial account above that memorialized in Lone Star's written invoices is barred by the Statute of Frauds contained in Texas' Uniform Commercial Code (UCC). *See* TEX. BUS. & COM.CODE ANN. § 2.201 (Vernon 1994). A contract for the sale of natural gas is a contract for the sale of goods under the UCC. *Fletcher v. Ricks Exploration,* 905 F.2d 890, 892 (5th Cir. 1990); *Gasmark, Ltd. v. Kimball Energy Corp.,* 868 S.W.2d 925, 928 (Tex.App.— Fort Worth 1994, no writ). Because the price of the goods at issue here is at least $500, enforceability requires compliance with the UCC's statute of frauds. *See* TEX. BUS. & COM.CODE ANN. § 2.201. Subsection (a) of section 2.201 provides:

(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

*Id.* § 2.201(a). That section further provides that "[a] contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable ... with respect to goods for which payment has been made and accepted or which have been received and accepted." *Id.* § 2.201(c)(3).

### *The Franchise Agreement*

■ Lone Star first claims that the trial court erred in granting EFP's motion for summary judgment because Lone Star's franchise agreement with the City of Marlin satisfies the writing requirement of the statute of frauds. Lone Star has requested that we take judicial notice of the Marlin city ordinance containing the franchise agreement. However, a copy of this document was not before the trial court. As the Supreme Court noted in *Sparkman v. Maxwell:*

[A]n appellate court is naturally reluctant to take judicial notice of matters such as municipal charters and regulations promulgated by state agencies when the trial court was not requested to do so and was not given an opportunity to examine the necessary source material. This does not mean that we would refuse to take judicial notice under similar circumstances where necessary to avoid an unjust judgment.

*Sparkman v. Maxwell,* 519 S.W.2d 852, 855 (Tex.1975). Although Rule of Evidence 201(f) has been construed to allow judicial notice to be taken for the first time on appeal, the Rule has also been construed as vesting the appellate court with discretion as to the decision. *See Martinez v. City of San Antonio,* 768 S.W.2d 911, 914–15 (Tex.App.—San Antonio 1989, no writ) (citing Wellborn, *Judicial Notice Under Article II of the Texas Rules of Evidence,* 19 ST. MARY'S L.J. 6 (1987)). Because Lone Star and the City of Marlin are the only parties to the franchise agreement provided by Lone Star in its motion, it does not affect the issue of whether there is a gas-purchase agreement with Lone Star. We therefore decline to take judicial notice of the ordinance.

### *The Invoices*

■ Lone Star asserts in the alternative that, there being no memorandum sufficient to satisfy section 2.201(a), EFP is liable for the gas it received and accepted

pursuant to section 2.201(c)(3). EFP argues that the monthly invoices sent by Lone Star satisfy the writing requirement of 2.201(a), and that under the last sentence of that subsection, those invoices are not enforceable beyond the quantities recited therein. We must therefore initially determine whether the monthly invoices satisfy section 2.201(a) sufficiently to be binding against Lone Star. If so, we must then determine whether section 2.201(c)(3) renders EFP liable for all gas it received and accepted notwithstanding the provisions of the written memoranda.

■ To satisfy section 2.201(a), a memorandum must meet three basic requirements. It must (1) evince an agreement for the sale of goods, (2) it must be "signed" by the party against whom enforcement is sought, and (3) it must contain a specified quantity. Tex. Bus. & Com. Code Ann. § 2.201 cmt. 1. (Vernon 1994). Although the accuracy of the stated quantity terms have been challenged by Lone Star, the invoices indicate that an agreement for the sale of natural gas was reached, and each invoice purports to memorialize the delivery of a specific quantity of natural gas to EFP's Marlin plant. The term "signed" includes "any symbol executed or adopted by a party with present intention to authenticate a writing." *Id.* § 1.201(39) (Vernon 1994). The invoices in evidence are printed on Lone Star's letterhead, and include its name and corporate address. Such information has been held sufficient to constitute a signature for purposes of the statute of frauds. *See Cox Engineering v. Funston Mach. and Supply Co.,* 749 S.W.2d 508, 511 (Tex.App.— Fort Worth 1988, no writ); *Jem Patents, Inc. v. Frost,* 147 Ga.App. 839, 250 S.E.2d 547, 548 (1978). We are guided by the comments to the UCC, which state:

> The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction ... The only term which must appear is the quantity term, which need not be accurately stated but recovery is limited to the amount stated.

*Id.* § 2.201 cmt 1.

■ We conclude that the invoices are sufficient to satisfy the statute of frauds and are enforceable against Lone Star "by way of action or defense." *Id.* § 2.201(a). The fact that the invoices may recite incorrect quantities does not affect their enforceability. *Id.* A quantity term, when contained in a memorandum signed by a party, binds that party even if the memorandum incorrectly states the quantity actually agreed upon. *Id.* Lone Star is limited in its recovery to the quantities of gas recited in its invoices.

■ Lone Star argues that because section 2.201(c) dispenses with the writing requirement for goods that have been "received and accepted," it is entitled to the price of all such gas notwithstanding the existence of a writing memorializing a lesser quantity. That section provides:

> (c) A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable
>
> (1) if the goods are to be specially manufactured for the buyer....
>
> (2) if the party against whom enforcement is sought admits ... that a contract for sale was made, but the contract is not enforceable beyond the quantity of goods admitted; or
>
> (3) with respect to goods for which payment has been made and accepted or which have been received and accepted.

TEX. BUS. & COM.CODE ANN. § 2.201(c). This subsection provides alternative methods for enforcing an agreement that is not memorialized by a writing sufficient to satisfy the statute of frauds, that is, which does not clearly indicate the exchange of goods, is not signed, or does not contain a quantity term. *Id.* cmt. 1. Specifically, subsection (c)(3) allows an otherwise unenforceable agreement to be binding as to goods "received and accepted." *Id.* By its own terms, subsection (c)(3) applies only to an agreement "which does not satisfy the requirements of subsection (a)." As such, it operates as a substitute for a valid written agreement, not a replacement for one. Subsection (a) makes it clear that a signed memorandum containing a quantity term binds the party that signed it even if the quantity term is inaccurate. *Id.* From the summary judgment evidence before it, the trial court could have properly concluded that Lone Star's claim is limited to those quantities of gas reflected in its written invoices. Because it is undisputed that EFP paid the invoiced amounts, summary judgment against Lone Star on its commercial account claim was appropriate.

## THE INDUSTRIAL ACCOUNT

Lone Star's claim for gas delivered after March 6, 1995 is governed by the Contract for Industrial Gas Service executed by the parties on that date. The contract requires EFP to "purchase and receive such gas from Company to meet Customer's natural gas requirement at Customers premises." EFP asserts that paragraph II(d) of the contract shields it from liability for the type of error that occurred in this case. That paragraph reads:

Meter measurements computed by company according to its standard operating practices shall be conclusive except where meter is found to be inaccurate by as much as 1 per cent fast or slow or failed to register, in either of which

cases Company shall repair or replace the meter. The quantity of gas delivered while the meter was inaccurate or failed to register shall be determined by correcting the error if the percentage of error is ascertainable by calibration test or mathematical calculation.

At issue in this case is whether the meter measurements recited in Lone Star's invoices were "meter measurements computed according to [Lone Star's] standard operating practices." If so, the agreement renders such measurements controlling in any dispute concerning the quantity of gas delivered, unless the meter itself is proven to be inaccurate. Because there is no allegation of meter inaccuracy in this case, EFP argues that Lone Star's meter measurements as computed by its customer information system and reflected in its monthly invoices are rendered conclusive by the clause. Lone Star responds that the purpose of paragraph II(b) is to provide a manner of settling disputes over gas consumption caused by malfunction of the meter itself. Because the error in this case was not a measurement error but a billing error, Lone Star argues that II(b) does not render the invoices conclusive.

When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (1994); *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex.1983). The agreement clearly indicates the parties' intent to provide certainty in billing disputes by eliminating the need to recalculate the gas quantities consumed once the bills have been computed by Lone Star's customer information system. The contract provides for only two situations in which Lone Star's quantity calculations would not control: (1) where the meter is proven to be inaccurate, or (2) where the meter measurements were not calculated according to Lone Star's stan-

dard operating practices. There being no allegation of meter inaccuracy in this case, we must determine whether the summary judgment evidence establishes that the measurements were calculated according to Lone Star's standard operating practices.

The summary judgment record includes the testimony of Beverly Woods, senior analyst in Lone Star's industrial billing department, who testified to the procedures for recording meter measurements and computing the amount to be billed to the customer. This information is also summarized in Lone Star's answers to EFP's written interrogatories. For industrial accounts, the on-site meter is read monthly and the reading is manually entered into a "meter book" and then transferred from the book into the customer information system. The system then computes the bill based on the customer data contained in its files. The bill then must pass system edits for volumes and dollar amounts, in which possible error is identified by large deviations from previous bills. Invoices then undergo a review for accuracy conducted by two billing department employees before they are deemed correct and mailed to the customer.

The summary judgment record also includes the deposition testimony of Richard Bone, Lone Star's gas transportation and marketing sales representative, his supervisor James Fielder, Tommy Pleasants, Lone Star's field district manager for Marlin, and Jarel Rayfield, a senior equipment specialist. All four witnesses agreed that the meter measurements were processed according to Lone Star's standard operating practices, but that the resulting invoices were erroneous due to the incorrect set-up of EFP's account within the customer information system.

The parties clearly recognized the possibility of errors in the measurement and calculation process that may occur for reasons other than meter malfunction, and an agreement was reached on how to avoid disputes over quantity calculations. The agreement is contained in paragraph II(b) of the contract, which renders Lone Star's meter measurements conclusive. When the parties have reached such an agreement, the results may not be attacked as merely erroneous absent an allegation of fraud or bad faith. *Texas Gas Corp. v. Hankamer*, 326 S.W.2d 944, 955 (Tex.Civ. App.—Houston 1959, no writ). There is no such allegation here.

The trial court could have properly concluded as a matter of law that Lone Star was bound by its computed meter measurements as recited in its invoices, and was thus not entitled to payment for amounts in excess of those previously billed to EFP. The trial court did not err in granting summary judgment against Lone Star on its industrial account claim.

### CONCLUSION

Lone Star is barred by the statute of frauds from seeking amounts due under EFP's commercial account that exceed those recorded in the written invoices sent to EFP during the term of the account. The terms of the Contract for Industrial Gas Service prevent Lone Star from disputing the meter measurement calculations recited in the invoices sent to EFP during the term of the industrial account. Because Lone Star concedes that EFP has paid the invoiced amounts in their entirety, the trial court properly rendered summary judgment against Lone Star on both claims.

The judgment of the trial court is affirmed.